**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **GILLIAN MILLER, LAKISHA AUSTIN, and ARTHUR and LUELLA DAVIS on behalf of themselves and all others similarly situated,**<br><br>      **Plaintiffs,**<br>**vs.**<br>**COUNTRYWIDE BANK, A DIVISION OF TREASURY BANK, N.A., COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE CORRESPONDENT LENDING, FULL SPECTRUM LENDING, INC., LOANS FOR RESIDENTIAL HOMES, CORP. and SUMMIT MORTGAGE LLC,**<br><br>      **Defendants.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **C.A. NO.**<br><br><br><br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs, Gillian Miller, Lakisha Austin and Arthur and Luella Davis ("Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned attorneys, allege as follows:

1.      This is a class action brought by Plaintiffs, on behalf of themselves and other similarly situated black homeowners, against Countrywide Bank, A Division of Treasury Bank, N.A., Countrywide Home Loans, Inc. and its wholly- owned subsidiaries, Countrywide Correspondent Lending and Full Spectrum Lending, Inc. (collectively "Countrywide" or "Defendants"), under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, <u>et</u> <u>seq</u>. ("ECOA") and the Fair Housing Act, 42 U.S.C. § 3601 <u>et seq</u>. Plaintiffs seek remedies for themselves and the

Class (defined in ¶ 18, below) for the discriminatory effects of the Defendants' home financing policies and practices.

2.      As described below, the Defendants have established a specific, identifiable and uniform credit pricing system, a component of which, referred to herein as the Discretionary Pricing Policy, authorizes unchecked, subjective surcharge of additional points and fees to an otherwise objective risk-based financing rate.  In other words, after a finance rate acceptable to the Defendants is determined by objective criteria (e.g., the individual's credit history, credit score, debt-to-income ratio and loan-to-value ratios), the Defendants' credit pricing policy authorizes additional discretionary financing charges and interest mark-ups.  These subjective, additional finance charges have a widespread discriminatory impact on black applicants for home mortgage loans, in violation of ECOA and the FHA.

3.      The Defendants have established policies for retail and wholesale access to their loan products that subject black financing applicants to a significantly higher likelihood of exposure to discretionary points, fees and interest mark-ups.  These costs drive up the average cost of a mortgage loan made by one of the defendants to black applicants.

4.      Plaintiffs seek declaratory and injunctive relief, disgorgement and restitution of monies disparately obtained from black borrowers.

## JURISDICTION AND VENUE

5.      Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under federal law.

6.      Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful discriminatory practice is alleged to have been committed in this District, Defendants regularly conduct business in this District, and the named Plaintiffs reside in this District.

## PARTIES

7.      Plaintiff, Gillian Miller, is a black homeowner who resides at 1485 River Street, Hyde Park, Massachusetts 02136.

8.      Plaintiff, Lakisha Austin, is a black homeowner who resides at 17 Richmere Road, Mattapan, Massachusetts 02126.

9.      Plaintiffs, Arthur and Luella Davis, are black homeowners who reside at 36R Richfield Street, Boston, MA 02125.

10.     Defendant, Countrywide Bank, a Division of Treasury Bank, N.A. ("Countrywide Bank") is a mortgage lender with a place of business at 1199 North Fairfax Street, Suite 500, Alexandria, VA, 22314.

11.     Defendant, Countrywide Home Loans, Inc. ("Countrywide Home Loans") is a mortgage lender with a principal place of business at 4500 Park Granada Blvd., Calabasas, CA 91302.

12.     Defendant, Countrywide Correspondent Lending ("Countrywide Correspondent") purchases mortgage loans from other lenders. Countrywide Correspondent Lending, is a wholly owned subsidiary of defendant Countrywide Home Loans, Inc, and has a principal place of business at 4500 Park Granada Blvd., Calabasas, CA 91302.

13.     Defendant, Full Spectrum Lending, Inc. ("Full Spectrum") originates sub-prime mortgage loans. Full Spectrum Lending is a wholly owned subsidiary of defendant Countrywide Home Loans, Inc., and has a principal place of business at 4500 Park Granada Blvd., Calabasas, CA 91302. Full Spectrum Lending is part of Countrywide Home Loans' Retail Channel.

14.     Unless otherwise stated, the Plaintiffs will refer to Countrywide Bank, Countrywide Home Loans and its wholly owned subsidiaries Countrywide Correspondent and Full Spectrum collectively as "Countrywide" or "Defendants."

15.     Defendant, Summit Mortgage, LLC, ("Summit") is a mortgage lender with a principal place of business at 301 Edgewater Place, Suite 310, Wakefield, MA 01880.

16.     Defendant, Loans For Residential Homes Mortgage Corp. ("Loans For Residential Homes Mortgage") is a mortgage broker with a principal place of business at 5586 Post Road, East Greenwich, RI 02818.

## CLASS ALLEGATIONS

17.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

18.     This class action is brought pursuant to ECOA and the FHA by the individual named Plaintiffs on behalf of themselves and all black consumers (the "Class") who obtained a Countrywide home mortgage loan in the United States between January 1, 2001 and the date of judgment in this action (the "Class Period") and who were subject to Countrywide's Discretionary Pricing Policy pursuant to which they paid discretionary points, fees or interest mark-ups in connection with their loan.

19.     Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

20.     The phrase "Discretionary Pricing Policy" refers to Countrywide's policy of authorizing its loan officers, brokers and correspondent lenders to impose subjective, discretionary charges and interest mark-ups, that are included in the finance charge loans they originate.

21.     Plaintiffs do not know the exact size or identities of the proposed Class, since such information is in the exclusive control of the Defendant.  Plaintiffs believe that the Class encompasses many thousands or tens of thousands of individuals who are geographically dispersed throughout the United States.   Therefore, the proposed class is so numerous that joinder of all members is impracticable.

22.     All members of the Class have been subject to and affected by the same Discretionary Pricing Policy.  There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the Class.   These questions include, but are not limited to the following:

    a.      the nature, scope and operations of  Countrywide's Discretionary Pricing Policy;

    b.      whether Countrywide Bank and Countrywide Home Loans and its subsidiaries, including, without limitation, Countrywide Correspondent and Full Spectrum, are creditors under the ECOA because, for example, in the ordinary course of its business they participate in the decision of whether or not to extend credit to consumers;

    c.      whether Countrywide's Discretionary Pricing Policy is a facially neutral credit pricing system that has effected racial discrimination in violation of ECOA;

    d.      whether there are statistically significant disparities between the amount of the discretionary charges   imposed on black persons and the amount of the discretionary charges imposed on white persons that are unrelated to creditworthiness;

    e.      whether any legitimate business reason for the Discretionary Pricing Policy can be  achieved by a credit pricing system less discriminatory in its impact;

f.      whether the Court can enter declaratory and injunctive relief; and

g.      the proper measure of disgorgement or damages.

23.     The claims of the individual named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiffs and the other members of the Class were subject to the same Discretionary Pricing Policy that has disproportionately affected black homeowners.

24.     The individual named Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection and discrimination actions.

25.     A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

26.     In the alternative, Countrywide has acted or refused to act on grounds generally applicable to the case, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

<u>**ALLEGATIONS OF CLASS-WIDE DISCRIMINATION**</u>

27.     Countrywide is one of the largest mortgage-lending companies in the United States.  Countrywide publicly promotes its home financing expertise by means of nationwide advertising campaigns.    In its advertisements, Countrywide solicits persons to apply for financing with Countrywide either in one of its offices or through one of the mortgage brokers whom Countrywide has authorized to accept applications on its behalf.

28.     Countrywide makes home-mortgage loans directly to consumers through its various subsidiaries, including sub-prime loans through its subsidiary Full Spectrum.

29.     Countrywide also makes home-mortgage loans that are arranged by its network of mortgage brokers.  Those loans are made in reliance on Countrywide's credit-granting policies and with the participation of Countrywide.

30.     Countrywide also obtains business through a network of correspondent lenders, such as Summit, which originates loans that Countrywide funds.  Those loans are made in reliance on Countrywide's credit-granting policies and with the participation of Countrywide.

31.     Due to Countrywide's policies as to where to place its offices and how to market its products, black borrowers are more likely than white borrowers to apply for credit from Countrywide through its sub-prime subsidiary, Full Spectrum, or from an authorized broker or a correspondent lender.

32.     Because of the Discretionary Pricing Policy, loans obtained from Countrywide through Full Spectrum or Countrywide's network of brokers or correspondent lenders are more expensive, on average, than loans obtained directly from Countrywide.

33.     Based on the latest available Home Mortgage Disclosure Act ("HMDA") data, available from the Department of Housing and Urban Development, blacks who borrow from Countrywide are over three times more likely than whites to have received a high-APR loan to purchase a home and over two times more likely to have received a high-APR to refinance their home.

34.     A high-APR loan is a loan whose APR is at least three percentage points higher than the interest rate on U.S. Treasury securities of the same maturity, at the time the loan was made.

35.     While credit differences may explain some part of the disparities in rate and terms, Countrywide's Discretionary Pricing Policy accounts for a significant portion of the disparity.

36.     Countrywide's Discretionary Pricing Policy is unrelated to a borrower's objective credit characteristics such as credit history, credit score, debt-to-income ratio and loan-to-value ratios and results in purely subjective charges that affect the rate otherwise available to borrowers.

37.     Countrywide provides authorized mortgage brokers and correspondent lenders with substantial information about its loan programs, rates and credit criteria, as well as its policies for compensating mortgage brokers and correspondent lenders who arrange business for it.

38.     Countrywide authorizes mortgage brokers who have signed a contract with it to accept applications on its behalf, quote financing rates and terms on it (within the limitations set by Countrywide), inform credit applicants of Countrywide's financing options and to originate finance transactions using Countrywide's forms, in accordance with its policies.

39.     Countrywide authorizes its correspondent lenders to make loans based on its credit-granting policies. Countrywide funds these loans before or shortly after they are consummated.

40.     In all of the home-mortgage-finance-transactions at issue, Countrywide advances the funds to make the loans and bears some or all of the risk of default. Countrywide provides its loan officers, brokers and correspondent lenders with credit applications, loan contracts and other required financing forms, as well as instructions on filling out such documents necessary to complete home mortgage transactions.

41.     After a customer provides credit information to one of Countrywide's loan officers, brokers, or correspondent lenders, Countrywide computes a financing rate through an objective credit analysis that, in general, discerns the creditworthiness of the customer.

42.     These credit analyses consider numerous risk-related variables of creditworthiness, including credit bureau histories, payment amounts, debt ratio, bankruptcies, automobile repossessions, charge-offs, prior foreclosures, payment histories, credit score, debt-to-income ratios, loan-to-value ratios and other risk-related attributes or variables.   On information and belief, Countrywide uses these variables to determine a "mortgage score" for each credit applicant.

43.     Based on these objective risk-related variables and the resulting mortgage score, Countrywide derives a risk-based financing rate at which it would provide a home mortgage, often called the "Par Rate."  Alternatively, experienced Countrywide loan officers, brokers and correspondent lenders can estimate the risk-related Par Rate by referring to the applicant's credit bureau determined credit score.

44.     Although Countrywide's initial analysis applies objective criteria to calculate this risk-related Par Rate, Countrywide then authorizes a subjective component in its credit pricing system —the Discretionary Pricing Policy — to impose additional non-risk charges. On information and belief, the applicable Par Rates and authorized discretionary charges are communicated by Countrywide to its Loan Officers, brokers and correspondent lenders via regularly published "rate sheets."   Such rate sheets are published by Countrywide via intranet and internet.

45.     The discretionary charges are paid by the customer as a component of the total finance charge (the "Contract APR"), without the homeowner knowing that a portion of their Contract APR was a non-risk-related charge.

46.     Loan officers, brokers and correspondent lenders have discretion, within the limits set by Countrywide, to impose discretionary mark-ups as additional points in interest – "a rate mark-up".  When there is a rate mark-up, Countrywide shares the additional income, even if the loan is originated by a broker or correspondent lender.

47.     Countrywide's Discretionary Pricing Policy, by design, causes persons with identical or similar credit scores to pay different amounts for the cost of credit.  As a result of using a subjective pricing component that is designed to charge persons with the same credit profiles different amounts of finance charge, the objective qualities of the initial credit analysis used to calculate the Par Rate are undermined and the potential for race bias becomes inherent in the transaction.

48.     The Discretionary Pricing Policy, although facially neutral (insofar as Countrywide uses the same or effectively the same policy for all credit applicants), has a disproportionately adverse effect on blacks compared to similarly situated whites in that blacks pay disparately more discretionary charges (both in frequency and amount) than similarly situated whites.  Statistical analysis of discretionary charges imposed on black and white customers of other mortgage companies that use credit pricing systems structured like that of Countrywide has revealed that blacks, after controlling for credit risk, are substantially more likely than similarly situated whites to pay such charges.

49.      Loan officers, brokers and correspondent lenders are agents of Countrywide for the purpose of setting credit price, which is always set based on Countrywide's policy.

50.     The disparate impact suffered by blacks is a direct result of Countrywide's Discretionary Pricing Policy in that Countrywide designed, disseminated, controlled, implemented and profited from the Discretionary Pricing Policy creating the disparate impact.

51.     Countrywide has a non-delegable duty to ensure that its mortgage financing structure and policies do not have a disparate impact on legally protected classes, such as blacks. Despite having such a non-delegable duty, Countrywide has chosen to use, and on information and belief, continues to use, a commission-driven, subjective pricing policy that it knows or should have known has a significant and pervasive adverse impact on black homeowners.

52.     The disparities between the terms of Countrywide's transactions involving black homeowners and the terms involving whites homeowners cannot be a product of chance and cannot be explained by factors unrelated to race, but, instead, are the direct causal result of the use of the discriminatory Discretionary Pricing Policy.

53.     There are no legitimate business reasons justifying Countrywide's discriminatory Discretionary Pricing Policy that could not be achieved by a policy that has no discriminatory impact or a greatly reduced discriminatory impact.

### ALLEGATIONS OF NON-DISCLOSURE – FRAUDULENT CONCEALMENT (TOLLING)

54.     Commission-driven, discretionary pricing systems – such as those in the real estate mortgage industry that are structurally similar to the system utilized by Countrywide – have been found to produce significant discriminatory effects.  Knowledge concerning the significant and pervasive discriminatory impact of such commission-driven, discretionary credit pricing systems has been widely circulated throughout the financing industry for several years, particularly since 1994, as a result of numerous high profile actions by the United States

Department of Justice and federal regulatory agencies.  Countrywide, as one of the largest mortgage companies in the United States, has known or should have known that its credit pricing system causes blacks to pay the Defendant more for mortgage financing than the amounts paid by white customers with identical or effectively identical credit scores.  The following various regulatory settlements involved discriminatory pricing policies structurally similar to Countrywide's pricing policy and were widely reported through the financing industry:

> United States v. Blackpipe State Bank, Civ. Act. No. 93-5115 (D. S.D. filed November 16, 1993)(charging American Indians higher interest rates)

> United States v. First National Bank of Vicksburg, No. 5:94 CV 6(B)(N) (S.D. Miss. filed Jan. 21, 1994) (charging African-Americans higher interest rates)

> United States v. Huntington Mortgage Co., No. 1; 95 CV 2211 (N.D. Ohio filed October 18, 1995)(charging African-Americans higher fees)

> United States v. Security State Bank of Pecos, No. SA 95 CA 0996 (W.D.Tex. filed October 15, 1995)(charging Hispanics higher interest rates)

> United States v. First National Bank of Gordon, No. CIV-96-5035 (W.D.S.D. filed April 15, 1996)(charging American Indians higher interest rates)

> United States v. Fleet Mortgage Corp., No. 96-2279 (E.D.N.Y. filed May 7, 1996)(charging African-Americans and Hispanics higher interest rates)

> United States v. Long Beach Mortgage Co., No. CV-96-6159 (C.D. Cal. filed Sept. 5, 1996)(charging African-Americans, Latinos, women and persons over age 55 higher interest rates)

55.    Despite the fact that Countrywide has known or should have known of the discriminatory effect of its credit pricing policy, none of the loan documents inform the customer that its finance rates are subjective and not based solely on risk-related characteristics.

56.    Although, pursuant to Countrywide's Discretionary Pricing Policy, the final credit rate that a customer pays for credit is subjective, Countrywide's advertisements, marketing materials and financing documents universally create and foster the image that Countrywide

offers non-negotiable, competitive finance rates that are objectively set by Countrywide based on credit-risk factors.

57.     Despite spending millions of dollars annually on advertising, marketing materials, and the creation and distribution of Countrywide financing documents that falsely create and foster the image that Countrywide offers competitive rates that are objectively set, the Defendant never discloses the truth to its credit applicants concerning the fact that: (a) its credit rates are subjective and can vary significantly among persons with identical credit profiles, and (b) that it has authorized and provided a financial incentive to its loan officers, authorized brokers and correspondent lenders to subjectively increase the credit rate above the rate otherwise available to homeowners.

58.     Countrywide's black customers, due to the inherent nature of the Countrywide's undisclosed pricing system and due to Countrywide's deception and concealment, have no way of knowing or suspecting (a) the existence of Countrywide's subjective credit pricing policy; (b) that they were charged additional subjective credit charges; and (c) that they were charged a disproportionately greater amount for their cost of credit than similarly situated white persons.

## FACTUAL ALLEGATIONS

### Facts Relating To Plaintiff Gillian Miller

59.     Gillian Miller resides at 1485 River St., Hyde Park, MA with her 3 children, ages 11, 14, and 20.

60.     In late 2005, early 2006, when Ms. Miller was seeking financing to purchase the Hyde Park home, her realtor referred her to Rachel Kemp of Summit Mortgage.

61.     Ms. Miller met with Ms. Kemp on several occasions to discuss the terms of financing. The meetings took place at Dunkin Donuts and at Ms. Miller's place of employment.

62.     On January 31, 2006, Ms. Miller entered into a mortgage transaction with Summit Mortgage as lender. The transaction was divided into two loans.

63.     The larger loan (Loan No. 53060025) was a 30-year, adjustable rate loan with a disclosed APR of 11.522%. The loan amount was $259,200.00. According to the note, the loan had a six-month variable rate feature.

64.     According to the HUD-One Settlement Statement, Ms. Miller paid $9,423.34 in settlement charges in connection with the larger loan, including, a 2% or $5,184 loan origination fee to Summit Mortgage, a $300 processing fee to Summit Mortgage LLC, and a $275 underwriting fee to Summit Mortgage, LLC. In addition, Ms. Miller paid a $300 application fee to Summit Mortgage LLC outside closing.

65.     The smaller loan (Loan No. 53060026), which had a loan amount of $64,800, is a 15-year fixed rate loan with a balloon feature, providing for a final payment of $55,245.25. The APR of the smaller loan is 11.317%.

66.     True and correct copies of Truth-in-Lending disclosure and HUD-One Settlement Statement provided in connection with Loan No. 53060025 are attached hereto and labeled Exhibit 1 and Exhibit 2, respectively.

67.     True and correct copies of Truth-in-Lending disclosure and HUD-One Settlement Statement provided in connection with Loan No. 53060026 are attached hereto and labeled Exhibit 3 and Exhibit 4, respectively.

68.     On information and belief, Countrywide Correspondent Lending table-funded the loans originated by Summit Lending.

69.     At the time of the transaction, Ms. Miller had a credit score that would have qualified with many lenders for a mortgage in the prime-market. Instead, Ms. Miller received mortgages at sub-prime rates and on sub-prime terms.

70.     According to Countrywide Correspondent Lending's commitment letter, dated January 26, 2006, Ms. Miller had a CHL credit grade of AA+.

71.     By notice dated January 31, 2006, the date the loans closed, Summit Mortgage assigned, sold or transferred the mortgage loans to Countrywide Home Loans, Inc.

72.     On information and belief, unbeknownst to Ms. Miller, the contract APR on the mortgage loans was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component added pursuant to the Countrywide's Discretionary Pricing Policy.

73.     On information and belief, Ms. Miller was subject to Countrywide's Discretionary Pricing Policy.

74.     On information and belief, Ms. Miller was charged a disproportionately greater amount in non-risk-related credit charges than similarly situated white persons.

### *Facts Relating to Plaintiff Lakisha Austin*

75.     Lakisha Austin resides at 17 Richmere Road, Mattapan, with her one-year old son.

76.     Ms. Austin purchased her Mattapan home in September 2004 with financing from Full Spectrum.

77.     When Ms. Austin was seeking financing to purchase the Mattapan home, her realtor at Burton Associates referred her to Countrywide Home Loan Consultant, Mark Coleman.

78.     Mr. Coleman is featured on Burton Associates' promotional materials and its website and, on information and belief, does some business out of Burton Associates' Dorchester office.

79.     Mr. Coleman provided Ms. Austin a Full Spectrum loan application, which she completed and submitted via email.

80.     On September 22, 2004, Ms. Austin entered into a mortgage transaction with Full Spectrum as lender. The transaction was divided into two loans.

81.     The larger loan (Loan No. 83247007) was a 30-year, adjustable rate loan with a disclosed APR of 8.156%. The loan amount was $297,600.00. According to the note, the loan had a three-year variable rate feature, and payments made during the first three years would only apply to interest.

82.     According to the HUD-One Settlement Statement, Ms. Austin paid $10,954.99 in settlement charges in connection with the larger loan, including, a 2% or $5,952 loan discount fee to Full Spectrum, and a $535 processing fee to Full Spectrum.

83.     Ms. Austin believes and therefore avers that she was not provided with a "discount" of any kind on the rate in the transaction.

84.     Ms. Austin was never offered an alternative loan with a higher rate that did not involve payment of discount points, and therefore had no opportunity to evaluate whether the "discount" would be advantageous to her.

85.     The smaller loan (Loan No. 66997971), which had a loan amount of $74,400, is a 20-year fixed rate loan with an APR of 10.094%.

86.     True and correct copies of Truth-in-Lending disclosure and HUD-One Settlement Statement provided in connection with Loan No. 83247007 are attached hereto and labeled Exhibit 5 and Exhibit 6, respectively.

87.     True and correct copies of Truth-in-Lending disclosure and HUD-One Settlement Statement provided in connection with Loan No. 66997971 are attached hereto and labeled Exhibit 7 and Exhibit 8, respectively.

88.     At the time of the transaction, Ms. Austin had a credit score that would have qualified with many lenders for a mortgage in the prime-market. Instead, Ms. Austin received mortgages at sub-prime rates and on sub-prime terms.

89.     On information and belief, unbeknownst to Ms. Austin, the contract APR on the mortgage loans was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component added pursuant to the Countrywide's Discretionary Pricing Policy.

90.     On information and belief, Ms. Austin was subject to Countrywide's Discretionary Pricing Policy.

91.     On information and belief, Ms. Austin was charged a disproportionately greater amount in non-risk-related credit charges than similarly situated white persons.

***Facts Relating to Plaintiff Arthur and Luella Davis***

92.     Arthur and Luella Davis ("the Davises") reside at 36R Richfield Street, Boston, Massachusetts.

93.     In May or June 2005, the Davises received a telephone call from loan broker Kevin Igle, a loan broker for Loans for Residential Home Mortgages "Residential Home Mortgages," a Rhode Island mortgage brokerage.

94.     The Davises refinanced their Dorchester home on August 31, 2005 with a loan arranged by Residential Home Mortgages.

95.     The lender in the transaction was Countrywide Bank.

96.     The August 31, 2005 refinance transaction (Loan No. 97460612) was a 30-year, adjustable rate loan with a disclosed APR of 8.269%. The loan amount was $231,000.00.

97.     According to the HUD-One Settlement Statement, the Davises paid $8,335.27 in settlement charges in connection with their loan, including, a $4,500.00 broker fee and $499.00 broker processing fee to Loans for Residential Homes. In addition, Loans For Residential Homes received a 2% or $4,620.00 yield spread premium from Countrywide Bank, which was paid outside closing.

98.     True and correct copies of Truth-in-Lending disclosure and HUD-One Settlement Statement provided in connection with the loan are attached hereto and labeled Exhibit 9 and Exhibit 10, respectively.

99.     On information and belief, unbeknownst to the Davises, the contract APR on the mortgage loans was actually a combination of an objective, risk-based calculation and a totally subjective, discretionary component added pursuant to Countrywide's Discretionary Pricing Policy.

100.    On information and belief, the Davises were subject to Countrywide's Discretionary Pricing Policy.

101.    On information and belief, the Davises were charged a disproportionately greater amount in non-risk-related credit charges and fees than similarly situated white persons.

**COUNT I**
**(DISCRIMINATION IN VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**
**AGAINST ALL DEFENDANTS EXCEPT SUMMIT BY PLAINTIFFS ON**
**BEHALF OF THE CLASS)**

102.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

103.    Countrywide is a creditor as defined in ECOA, and in the ordinary course of its business, participated in the decision of whether or not to extend credit to the Plaintiffs, the proposed Class representatives herein, and all prospective Class members.

104.    Countrywide designed, disseminated, controlled, implemented and profited from the discriminatory policy and practice alleged herein — the Discretionary Pricing Policy — which has had a disparate economic impact on blacks compared to similarly situated whites.

105.    All actions taken by the Countrywide loan officers and Countrywide's brokers and correspondent lenders were in accordance with the specific authority granted to them by Countrywide and were in furtherance of Countrywide's policies and practices.

106.    As a result of Countrywide's Discretionary Pricing Policy, Countrywide has collected more in finance charges from blacks than from similarly situated white persons, for reasons totally unrelated to credit risk.

107.    Countrywide's Discretionary Pricing Policy violates the Equal Credit Opportunity Act.

108.    Plaintiff and prospective class members are aggrieved persons as defined in ECOA by virtue of having been subject to the discriminatory, Discretionary Pricing Policy.

**COUNT II**
**(DISCRIMINATION IN VIOLATION OF THE**
**FAIR HOUSING ACT AGAINST ALL DEFENDANTS EXCEPT SUMMIT BY**
**PLAINTIFS ON BEHALF OF THE CLASS)**

109.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

110.    Countrywide engaged in residential real estate-related transactions with respect to the Plaintiffs, the proposed Class representatives herein, and all prospective Class members.

111.    Countrywide's Discretionary Pricing Policy has resulted in discrimination with respect to the Plaintiffs, the proposed Class representatives herein, and all prospective  members of the Class.

112.    As a result of Countrywide's Discretionary Pricing Policy, Countrywide has collected more in finance charges from blacks than from similarly situated white persons, for reasons totally unrelated to credit risk.

113.    Countrywide's Discretionary Pricing Policy violates the Fair Housing Act and constitutes actionable discrimination on the basis of race.

114.    Plaintiff and the Class are aggrieved persons as defined in FHA by virtue of having been subject to the discriminatory, Countrywide's Discretionary Pricing Policy.

**COUNT III**
**(DISCRIMINATION IN VIOLATION OF THE**
**EQUAL CREDIT OPPORTUNITY ACT AGAINST SUMMIT BY PLAINTIFF GILLIAN**
**MILLER ON BEHALF OF HERSELF, INDIVIDUALLY)**

115.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

116.    Summit is a creditor as defined in ECOA, and in the ordinary course of its business, participated in the decision of whether or not to extend credit to the Plaintiff.

117.    The Plaintiff, Ms. Miller, is a member of a protected class.

118.    Following her credit application, Summit extended credit to Ms. Miller on sub-prime rather than prime terms because of her race.

119.    During the same period, Summit extended credit to similarly situated white borrowers on prime terms.

120.    Summit's conduct violates the Equal Credit Opportunity Act.

121.    Ms. Miller is an aggrieved person as defined in ECOA by virtue of having been subject to this disparate treatment.

## <u>COUNT IV</u>
## (DISCRIMINATION IN VIOLATION OF THE
## FAIR HOUSING ACT AGAINST SUMMIT BY PLAINTIFF GILLIAN MILLER ON BEHALF OF HERSELF, INDIVIDUALLY)

122.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

123.    Summit engaged in residential real estate-related transactions with respect to Ms. Miller.

124.    The Plaintiff, Ms. Miller, is a member of a protected class.

125.    Following her credit application, Summit extended credit to Ms. Miller on sub-prime rather than prime terms because of her race.

126.    During the same period, Summit extended credit to similarly situated white borrowers on prime terms.

127.    Summit's conduct violates the FHA.

128.    Ms. Miller is an aggrieved person as defined in FHA by virtue of having been subject to this disparate treatment.

## <u>COUNT V</u>
## (DISCRIMINATION IN VIOLATION OF THE
## EQUAL CREDIT OPPORTUNITY ACT AGAINST LOANS FOR RESIDENTIAL HOMES BY PLAINTIFFS ARTHUR AND LUELLA DAVIS ON BEHALF OF THEMSELVES, INDIVIDUALLY)

129.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

130.    Loans For Residential Homes is a creditor as defined in ECOA, and in the ordinary course of its business, participated in the decision of whether or not to extend credit to the Plaintiff.

131.    The Davises are members of a protected class.

132.     Following their credit application, Loans For Residential Homes discriminated against the Davises by charging them discretionary fees in amounts in excess of fees they charged similarly situated white borrowers.

133.     Loans For Residential Homes' conduct violates the Equal Credit Opportunity Act.

134.     The Davises are aggrieved persons as defined in ECOA by virtue of having been subject to this disparate treatment.

**COUNT VI**
**(DISCRIMINATION IN VIOLATION OF THE**
**FAIR HOUSING ACT AGAINST LOANS FOR RESIDENTIAL HOMES BY**
**PLAINTIFFS ARTHUR AND LUELLA DAVIS ON BEHALF OF THEMSELVES,**
**INDIVIDUALLY)**

135.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

136.     Loans For Residential Homes engaged in residential real estate-related transactions with respect to the Davises.

137.     The Davises are members of a protected class.

138.     Following their credit application, Loans For Residential Homes discriminated against the Davises by charging them discretionary fees in amounts in excess of fees they charged similarly situated white borrowers.

139.     Loans For Residential Homes' conduct violates the Fair Housing Act.

140.     The Davises are aggrieved persons as defined in FHA by virtue of having been subject to this disparate treatment.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

*On behalf of the Class:*

a.      Certify this case as a class action and certify the named Plaintiffs herein to be adequate class representative and her counsel to be class counsel;

b.      Enter a judgment, pursuant to 15 U.S.C.  1691e(c) and/or 42 U.S.C. § 3613, declaring the acts and practices of Defendants complained of herein to be in violation of ECOA and the FHA;

c.      Grant a permanent or final injunction, pursuant to 15 U.S.C. 1691e(c) and/or 42 U.S.C. § 3613(c), enjoining the Defendants, and the Defendants' agents and employees, affiliates and subsidiaries, from continuing to discriminate against plaintiffs and the members of the Class because of their race through further use of the Discretionary Pricing Policy or any non-risk-related Discretionary pricing policy employed by the Defendants;

d.      Order the Defendants, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c), to adopt and enforce a policy that requires appropriate training of the Defendants' employees and its brokers and correspondent lenders to prevent discrimination;

e.      Order Countrywide Home Loans, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c), to monitor and/or audit the racial pattern of its financings to ensure the cessation of discriminatory effects in its home mortgage transactions;

f.      Order disgorgement, pursuant to 15 U.S.C. § 1691e (c), of all disproportionate non-risk charges imposed on blacks by the Defendants' Discretionary Pricing Policy; and order the equitable distribution of such charges, as restitutionary relief, to all appropriate class members;

g.      Order actual and punitive damages to the Plaintiff and the class pursuant to 42 U.S.C. § 3613(c);

h.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees, pursuant to 15 U.S.C.  § 1691e(d) and/or 42 U.S.C. § 3613(c); and

i.      Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

*On behalf of Ms. Miller:*

j.      Order actual and punitive damages to the Plaintiff pursuant to 42 U.S.C. § 3613(c);

k.      Award Ms. Miller the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees, pursuant to 15 U.S.C.  § 1691e(d) and/or 42 U.S.C. § 3613(c); and

l.      Grant Ms. Miller such other and further relief as this Court finds necessary and proper.

*On behalf of the Davises:*

m.      Order actual and punitive damages to the Davises pursuant to 42 U.S.C. § 3613(c);

n.      Award the Davises the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees, pursuant to 15 U.S.C.  § 1691e(d) and/or 42 U.S.C. § 3613(c); and

o.      Grant the Davises such other and further relief as this Court finds necessary and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,
On Behalf of the Plaintiffs,


/s/ Gary Klein
        Gary Klein

Gary Klein (BBO # 560769)
Shennan Kavanagh (BBO # 655174)
Gillian Feiner (BBO # 664152)
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA   02111-2810
Telephone:  (617) 357-5500 ext. 15
Facsimile:  (617) 357-5030


Marvin A. Miller
Matthew E. VanTine
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  (312) 332-3400


Samuel H. Rudman
Robert M. Rothman
Mark S. Reich
LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100
Facsimile:   (631) 367-1173


Thomas M. Sobol (BBO # 471770)
Gregory Matthews (BBO # 653316)
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Boston, MA 02142
Telephone: (617) 475-1950
Facsimile: (617) 482-3003

DATE: July 12, 2007